UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.      Case No.: 6:21-cv-01682

THE LINKS SOUTH AT HARBOUR
VILLAGE CONDOMINUM
ASSOCIATION, INC.,

    Defendant.

## COMPLAINT

The Plaintiff, the United States of America, alleges:

## NATURE OF ACTION

1. This is a civil action to enforce the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 3612(o).

3. Venue is proper in this judicial district pursuant to 42 U.S.C. § 139l(b), because the events giving rise to this action occurred in this judicial district.

## PARTIES

4. The Plaintiff is the United States of America, which brings this action on behalf of Charlie Burge and Anna Burge. Mr. and Mrs. Burge are "aggrieved persons" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i).

5. The Defendant, The Links South at Harbour Village Condominium Association, Inc. ("Links South"), is a condominium association that governs and enforces rules and regulations for The Links South at Harbour Village, a condominium complex with 188 units located at 4622 Links Village Drive in Ponce Inlet, Florida.

6. Links South is a condominium association that is governed by a Board of Directors, who are elected by the homeowners to oversee the business of the community and uphold and enforce the community's rules and policies.

## FACTUAL ALLEGATIONS

7. Since July 1, 2009, Mr. and Mrs. Burge have owned and resided at 4670 Links Village Drive, Unit B502, Ponce Inlet, Florida 32127 ("the subject property"). The subject property is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

8. Mr. Burge is a retired General Superintendent from the New York City Department of Sanitation. Mr. Burge worked for the Department of Sanitation at the time of the September 11, 2001 attack on the World Trade Center in Manhattan, New York, also referred to as "9/11."

9. The New York City Department of Sanitation supported the police and firefighters who died and were buried in the rubble at the site of the World Trade

Center's "Twin Towers." As part of his duties, Mr. Burge spent over 400 days removing debris from the 9/11 disaster site. Specifically, as part of his duties, for a period of 18 months, Mr. Burge was responsible for clearing the debris at the World Trade Center disaster site and taking the debris to Staten Island, in addition to sifting through the rubble.

10. As a result of his experiences working to clear the rubble following 9/11, Mr. Burge was diagnosed with certain upper respiratory conditions, gastrointestinal issues, and post-traumatic stress disorder ("PTSD"), among other conditions, that are certified for coverage under the World Trade Center Health Program.

11. Specifically, as a direct result of his work on the World Trade Center disaster site, Mr. Burge has been diagnosed with, among other things, Barrett's esophagus without dysplasia, malignant melanoma of skin, esophageal reflux, obstructive sleep apnea, prolonged PTSD, chronic pharyngitis, nasopharyngitis, and chronic sinusitis. Mr. Burge's disabilities limit his major life activities, including his ability to breathe, swallow, and survive without regular medical treatment and medications.

12. As a result of his work at the World Trade Center disaster site, Mr. Burge is a person with a disability within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h).

13. Prior to October 27, 2017, the Burges removed their shoes before entering their condominium and placed the shoes outside their front door to avoid tracking allergens inside of the unit and aggravating Mr. Burge's disabilities.

14. Prior to October 27, 2017, the Burges received no complaints regarding the shoes outside their unit.

15. On or about October 27, 2017, Links South issued Mr. and Mrs. Burge their first rule violation notice for leaving shoes outside their front door. The notice informed Mr. and Mrs. Burge that if the violation continued for 10 days after the date of issuance, Links South would file an action to enforce the Condominium Association's rules.

16. On or about January 24, 2018, Links South issued another rules violation notice for leaving shoes outside the Burges' front door. The notice referenced the Harbour Village Golf and Yacht Club Community Rules and Regulations that were adopted by the Board of Directors on May 15, 2015, and effective July 1, 2015.

17. Specifically, the January 24, 2018 notice referenced Rule #4 under the "Storage of Personal Items" section that was "Specific to Links South Only." Rule #4 stated as follows:

> Personal items may not be left at your front door such as shoes, chairs, towels, fishing poles, boogie boards, skateboards, etc. A doormat and a wreath are the only items allowed at your front door.

18. In addition, the January 24, 2018 notice informed Mr. and Mrs. Burge that if items in front of their door were not removed by January 30, 2018, Links South staff would remove and hold the items for up to 48 hours before discarding.

19. On or about January 31, 2018, Links South removed Mr. Burge's shoes and placed them in the Condominium Association's office. Mr. and Mrs. Burge

contacted the Ponce Inlet Police Department, who assisted in retrieving Mr. Burge's shoes from the Condominium Association's office.

20. On or about February 21, 2018, Mr. and Mrs. Burge received another rules violation notice for leaving shoes outside their unit.

21. On or about February 22, 2018, Links South removed Mr. Burge's shoes that were outside his unit. Mr. and Mrs. Burge again contacted the police to assist with retrieving the shoes.

22. On or about March 2, 2018, counsel for Links South mailed a letter to Mr. and Mrs. Burge advising them to "cease and desist" from placing personal belongings outside their unit. Counsel for Links South threatened to seek an injunction against Mr. and Mrs. Burge if they did not comply.

23. On or about April 18, 2018, Mr. and Mrs. Burge, through their counsel, submitted a written request for a reasonable accommodation to allow them to leave their shoes outside their unit because of Mr. Burge's disabilities. Mr. and Mrs. Burge provided two documents from Mr. Burge's medical providers dated November 16, 2017. One was a doctor's recommendation to not track outdoor allergens, chemicals, or pollutants into Mr. Burge's home because of his severe allergies. The other was a physician assistant's request to allow Mr. Burge to leave shoes or work boots outside because of Mr. Burge's allergies. Additionally, Mr. and Mrs. Burge provided documents referencing a shoe-borne pathogen study and a letter from the World Trade Center Health program outlining Mr. Burge's specific conditions.

24. On or about April 20, 2018, counsel for Links South requested all Mr. Burge's supporting documents and an explanation as to why an accommodation was necessary.

25. On or about April 27, 2018, Mr. and Mrs. Burge, through counsel, explained to Links South that the April 18, 2018 letter was the first written request for accommodation and that prior communications requesting accommodations were verbal or informal.

26. On or about May 3, 2018, counsel for Links South responded that the documentation provided on April 27, 2018 did not establish a causal relationship between Mr. Burge's shoes and "an undefined allergy or disability." Links South requested (1) to inspect and photograph the unit and examine all shoes and vegetation within the unit and balcony; (2) authenticated copies of Mr. Burge's medical records for the past two years relating to any allergies or medical conditions that serve as a basis for an accommodation; (3) authenticated copies of Mr. Burge's prescription records or over the counter medication being taken in the past year related to allergies; (4) copies of any test results of the unit for any allergens or molds within the past year; and (5) any authoritative materials, which substantiate the correlation between an allergy documented by Mr. Burge and the need to store shoes outside.

27. On or about May 22, 2018, Mr. and Mrs. Burge's counsel explained to Links South that Mr. Burge does not have an "undefined allergy or disability," but rather a diagnosis approved by the World Trade Center Health Program. Counsel also provided Links South with prescription records, Continuous Positive Airway Pressure

6

(CPAP) machine receipts, a copy of a medical study on the occurrence of bacteria on shoes, pictures of the unit, and explanations on how Mr. and Mrs. Burge make every attempt to make their home hypoallergenic.  Additionally, counsel provided Links South with a letter from Mr. Burge's allergist dated May 14, 2018, which noted that Mr. Burge was being treated for multiple allergens.

28. Specifically, the May 14, 2018 letter from Mr. Burge's treating allergist stated:

> Although issues may or may not occur when shoes are inside, some potential allergens and pesticides could cause extreme or even life-threatening respiratory distress or gastrointestinal inflammation that are hard to recover from. All caution should be taken to avoid these high-risk outcomes.  It would be beneficial to make an arrangement for shoes to be stored outside of the home.

29. On or about May 30, 2018, counsel for Links South replied that the May 14, 2018 letter from the allergist did not establish a nexus between Mr. Burge's allergies or other disabilities and his shoes.  Further, counsel for Links South noted that the disability is not obvious and "the medical professional's opinion must satisfy the definition of disability."  Additionally, counsel for Links South requested a professional opinion on whether placing the shoes in a sealed container inside the home would resolve the concerns.

30. On or around February 5, 2019, Mr. and Mrs. Burge's counsel provided another letter from Mr. Burge's physician.  The letter specified and explained Mr. Burge's conditions and stated that Mr. Burge "is allergic to mold, mites, dust, pollen,

trees, and grasses, all of which may exacerbate his conditions." The letter further explained:

> These upper respiratory conditions cause difficulty primarily with breathing and swallowing, but can also affect speaking, eating, and hearing . . . [Mr. Burge] takes regular allergy injections to control swelling and carries an epi-pen to ensure his ability to breath and swallow.

31. Mr. Burge's physician also recommended that Mr. Burge leave his shoes outside and noted that "bringing his recently worn shoes indoors puts Mr. Burge at unnecessary risk of inflammation, difficulty breathing or swallowing, a possible complete inability to breathe or swallow."

32. The letter from Mr. Burge's physician further noted that a patient with Mr. Burge's conditions should employ many strategies to minimize exposure to allergens and recommended leaving "their most recently worn shoes outside where such pollutants may dissipate over time in open air without the risk of transfer to Mr. Burge's living area."

33. In addition, Mr. Burge's physician rejected the suggestion that Mr. Burge place his shoes in a sealed container and explained, "allowing contaminated objects to remain in a small, enclosed space does not allow allergens, bacteria, and pollutants to dissipate, creating a greater chance of contamination, reaction, and inflammation."

34. On or about February 19, 2019, counsel for Links South replied that "the doctor's letter does not connect the dots by stating specifically the nexus of such allergies to the specific substance presumably on his shoes." Counsel for Links South

also asked Mr. Burge if a doctor or laboratory performed tests on Mr. Burge's shoes, how Mr. Burge's doctor advised him to deal with shoes inside his vehicle, and if Mr. and Mrs. Burge had any peer-reviewed medical articles that substantiated the correlation between Mr. Burge's allergies and leaving his shoes outside.

## HUD ADMINISTRATIVE PROCESS

35. Mr. and Mrs. Burge timely filed a fair housing complaint with the United States Department of Housing and Urban Development ("HUD") on or about July 12, 2019, which they subsequently amended.

36. Pursuant to 42 U.S.C. § 3610, the Secretary of HUD (the "Secretary") conducted and completed an investigation of the complaint, attempted conciliation without success, and prepared a final investigative report. Based on the information gathered in the investigation, the Secretary found that reasonable cause existed to believe that the Defendant violated the Fair Housing Act.

37. On August 19, 2021, the Secretary issued a Charge of Discrimination ("Charge"), pursuant to 42 U.S.C. § 3610(g)(2), charging the Defendant with engaging in discriminatory housing practices.

38. On September 8, 2021, the Burges and the Defendant separately elected to have the claims asserted in the Charge resolved in a civil action pursuant to 42 U.S.C. § 3612(a).

39. On September 9, 2021, the Chief Administrative Law Judge issued a Notice of Election to Proceed in United States Federal District Court and terminated the administrative proceeding on Mr. and Mrs. Burge's complaint.

40. Following this Notice of Election, the Secretary authorized the Attorney General to commence a civil action, pursuant to 42 U.S.C. § 3612(o).

## CLAIMS FOR RELIEF

41. The allegations set forth above are incorporated by reference.

42. The Defendant, through the above-referenced actions, has:

    a. Discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, in violation of 42 U.S.C. § 3604(f)(2); and

    b. Refused to make reasonable accommodations in rules, policies, practices, or services, which were necessary to afford Mr. and Mrs. Burge an equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B).

43. As a result of Link South's discriminatory policies and actions, Mr. and Mrs. Burge have suffered damages.

44. The Defendant's discriminatory conduct was intentional, willful, and taken in reckless disregard of the rights of Mr. and Mrs. Burge.

WHEREFORE, the United States prays that the Court enter an order:

A. Declaring that the discriminatory conduct of the Defendant as set forth above violates the Fair Housing Act;

B. Enjoining the Defendant, its agents, employees, successors, and all other persons in active concert or participation with the Defendant from discriminating against any person because of a disability, in violation of the Fair Housing Act;

      C.     Ordering the Defendant to take such affirmative steps as may be necessary to restore, as nearly as practicable, Mr. and Mrs. Burge to the position they would have been in but for the discriminatory conduct;

      D.     Ordering the Defendant to take such actions as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of its unlawful conduct, including implementing policies and procedures to ensure that no applicants or tenants are discriminated against because of disability;

      E.     Awarding monetary damages to Mr. and Mrs. Burge pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1); and

      F.     Ordering such additional relief as the interests of justice may require.

      45.    The Plaintiff demands trial by jury.

Dated: October 8, 2021

        Respectfully submitted,

        **KARIN HOPPMANN**
        Acting United States Attorney


By:   */s/ Yohance A. Pettis*
        **YOHANCE A. PETTIS**
        Deputy Chief, Civil Division
        Assistant United States Attorney
        Florida Bar No. 021216
        **ERIN CHOI**
        Assistant United States Attorney
        USA No. 196
        400 North Tampa Street, Suite 3200
        Tampa, Florida 33602
        Telephone: 813-274-6000
        Facsimile: 813-274-6198
        E-mail: Yohance.Pettis@usdoj.gov
        E-mail: Erin.Choi@usdoj.gov
        *Counsels for the United States of America*